On an appeal from a decree of the Superior Court of Chancery for the Richmond District, pronounced by the late Judge of that Court.
This was a cause of much expectation, and of considerable importance as it respected the sum in controversy; but the points of law presented to the consideration of the Court were confined within very narrow limits indeed.
The principal point on which the case turned, and that on which the Court seems to have decided, was, whether such contumacy in the defendant as would authorise a Court of Equity to presume against him as a spoliator, (1) would also warrant a decree for a sum of money, when the bill was brought for the specific execution of an agreement. Another point was, whether an attachment, and, afterwards, a writ of sequestration were regularly, awarded in. this case.
The case was this: Ross filed a bill against Hook in the High Court of Chancery, about the year 1793, for the purpose of obtaining a settlement of the affairs of a mercantile connexion which they had formed in 1771; and obtained an order for an account. On the 30th of March, 1795, an agreement, sometimes called a compromise, was made between them; and on the succeeding day, Ross, in what is styled a missive, which was meditated in the compromise, proposed a change in the compromise itself; and Hook assented to the missive.
The terms of this compromise not having been executed by Hook, Ross, in the year 1799, brought the present suit in the High Court of Chancery. The bill stated the partnership to have existed between them in the year 177-, in which Ross had an interest of three-fourths and Hook of one-fourth ; and that the business was to be conducted by Hook; that Ross sued Hook for an account, (referring to the suit first mentioned,) and, an order having been made to that effect, an agreement was entered into, constituting all Hook’s property partnership stock, and giving to Ross two-thirds and to Hook one-third; that Hook would not render the account, and in other respects “specially perform his said agreement.” The proceedings in the former suit and the agreement were said to be annexed; 'x'and the prayer of the bill was, that Hook “might be compelled specially” to perform the said agreement, to execute the necessary “conveyances, and to pay to Ross what might be due to him,” &c.
An attachment for not answering having been served upon Hook, in March, 1800, the usual general order for taking the bill for confessed nisi was entered ; a copy of which was delivered to Hook on the 6lh of May following. •
In August, 1800, Hook answered, and admitted, that on the 30th of March, 1795, he entered into the said agreement or compromise, which was intended absolutely to settle and put an end to the former suit, and include all their disputes; though it was a harsh compromise to him, and assented to while he was in difficulty; considering which, he, for some time, believed that Ross would not insist upon the execution of it to the extreme. After the compromise, he expected the suit had been dismissed.
Hook further answering, admitted that' the copartnery began in 1771, but said it was to continue for seven years only; that, during that period, the trade was a losing-one ; goods being retailed on credit as low as 65 and 75 per cent, advance on sterling *146 cost, and tobacco producing loss in its sales in 1771, 1772, and 1773; in 1774 the revolution was commencing, and in 1775 imports and exports were stopped; and, before any considerable collections could be made, depreciation of paper money took place; that Hook put his all into Ross’s hands at the commencement of the copartnery, being about 1,3001. sterling, and Ross received many of the debts, but Hook, until after 1775 and 1776, had but little of the partnership money; that the money realized by Hook was at a great loss; that Hook’s present property had been acquired by his efforts since the partnership ceased; that the goods were imported through Ross’s partners and correspondents, and perhaps at prices improperly advanced; and that Hook had made great payments to Ross.
On the 22d day of September, 1800, the accounts were referred to a commissioner; but on the 3d of October, 1800, on Ross’s motion, that order was set aside, and the commissioner was directed to state an account of payments since the 30th of March, 1795: and of the lands, slaves, goods and credits of Hook on that day: — To estimate the value of those lands, slaves and goods, and to report the rents and profits.
*On the 10th of March, 1801, the commissioner reported, and stated his appointments for a meeting as follows: 5th November, 1800 ; — Ross attended, not Hook. 22d December, Ross filed an account of payments by Hook ; — Hook attended, and business was adjourned from day to day, that Hook might ' propose a compromise. Hook said that he could not render the accounts required by the'decree of October 3, 1800. The commissioner then prepared a statement, shewing how Hook was to perform the decree, and appointed tbe 20th of February, 1801, for a meeting. — Ross appeared with every paper: Hook did not.
On the 11th of March, 1801, an attachment was awarded against Hook, for refusing to attend the commissioner; upon which the return made by the sheriff was, i:not found within my bailiwick.”
On the 26th of May, 1801, a sequestration was awarded against Hook, to enforce his attendance before the commissioner.
This severe process was executed in the most minute manner; an inventory was returned of Hook’s estate, and he was deprived of the whole. The sequestrators, in their report, set forth the immense injury to which Hook was subjected by the operation of this process.
On the 7th of October, 1801, the Court ordered the lands to be rented out, and the other estate to be sold; and allowed the se-questrators five dollars per day. A report of the sales made by . them was returned to Court.
On the petition of Hook for a supersedeas to the sequestration, and offering other security, (which consisted of a deed of trust for the whole of his property,) the supersedeas was awarded, and the sequestra-tors were to obtain three dollars per day for their trouble. The sales had commenced when the supersedeas reached a part of the sequestrators. The remaining property was relieved.
On the 20th of November, 1801, the commissioner of the Court (Mr. Wm. Hay) reported, that in obedience to the order of the 3d of October, 1800, he, on the 23d of October, 1801, gave Hook notice to attend at his office on the said 20th of November, 1801, with the books, &c. from 1771 to the 30th of March, 1795; that the parties attended, but Hook would not produce them; and the commissioner suggested that the order for referring the accounts made in the old suit should be resumed and acted upon :• — ■ he proceeded accordingly, and entered into a lengthy and able detail to justify his proceedings. He then took the *depositions of^two witnesses to shew the statement of accounts from the books of Ross and Hook ; — he proceeded to report as to the compromise of the 30th of March, 1795, and endeavoured to shew, from the conduct of Hook, that, it ought not to form the basis of the account: he then proposed a certain mode of adjustment to the parties; which was, that the sequestrated property should be included in a deed of trust to secure Ross, except some particulars which were noted; and Hook assented to it, unless disapproved by his counsel. The commissioner now professed to state the accounts as they stood before the compromise, to introduce the payments made by Hook, and the credits due to him under the memorandum referred to in the compromise. The grounds of this statement are the books and the testimony of witnesses; and the copartnery is extended, beyond the date of the compromise, (the 30th of March, 1795,) to the 26th of December, 1795.
At the same term that this account was returned into Court, Ross pressed the consideration of it: Hook’s counsel opposed it as being contrary to the practice of the Court, and because it was impossible for them, in the short period allowed, to possess themselves of the necessary information, to do justice to their client.
On the 2d of March, 1802, Hook’s counsel filed exceptions to the report of the commissioner, to which Ross replied. Among the items excepted to was an allowance to John F. Price, the agent of Ross, in discovering to the sequestrators the property of Hook.
On the 24th of March, 1803, the decree of the Chancellor was rendered. It overruled the exceptions of Hook’s counsel and decreed against him 16,3471. 4s. 7d. 1-2, with interest on 12,2291. 12s. 2d. 3-4, from the first of January, 1802; and allowed the sequestrators five dollars a day.
From this decree Hook took an appeal to the Supreme Court of Appeals.
Several papers which were before the Master Commissioner were deposited by him with the Clerk of the Superior Court of Chancery after the decree was pronounced. These, on the mdtion of Hook, were certified to the Court of Appeals to avail only what that Court should suffer them to avail. Among these papers were many filed by Ross; but such, as were important to the cause, and desired by Hook, to be filed with the record, were specially noted. They are the following: 1. A letter from Hook to Ross, of September, 1795, complaining of the hardship of *the compromise. — 2. Hook’s answer, filed in order to be relieved from the attachment.— *147 3. An agreement, sometimes called a missive, between Hook and Ross, dated March 31, 1795, and the memorandum thereto annexed.— 4. A deposition, and Hook’s answer shewing why the books could not be procured. — 5. Hook’s petition to the Chancellor requesting him to inspect the answer, which could not be filed under the then circumstances; Ross’s reply; and Hook’s reply to him. — 6. The compromise, or compound, between Ross and Hook, of March 30, 1795.
This cause was very elaborately and very ably argued by the Attorney General, Randolph and Wickham for the appellant, and by Warden and Call for the appellee. Most of the argument, however, having relation to the proceedings in the cause in the Superior Court of Chancery, and the report ox the Master Commissioner, which was no further sanctioned by the Court of Appeals than as the sum reported by him was to stand as a security for the appellant’s compliance with the specific agreement, of the 30th of March, 1795, and with the modification of that agreement expressed in the missive of the next day, it will be unneces-sar}' to notice many of the points made by counsel in the course of their argument.
On the part of the appellant it was contended that the compromise was the true basis of settlement; that the affairs of Hook and Ross being various and complicated, it was important to both to end the controversy, which might have grow’n out ■of the suit of 1793. This furnished a sufficient motive to Ross, to enter into the compromise of 1795, which being executed with all the solemnities of law, and founded on a valuable consideration, completely put an end to all preexisting controversies and essentially changed the relations of the parties. Yet the commissioner had reported, and the Chancellor decreed, as if no compromise existed. That, on general principles, the decree could not be supported. The bill having been brought for a specific performance, that alone ought to have been decreed. That, even if Hook were in contempt, still it would neither justify the proceedings against him, nor would it warrant the decree of the Court, for a sum of money grounded on a report which professed to open the old accounts, as if they had not been closed the compromise. All that could have been done was to presume against him as to those subjects which were embraced by *tha1. agreement, or to commit him to prison for the contempt. But it was denied that Hook was guilty of any contempt: for he only refused to produce books and papers which the commissioners had no right to call for. It was said that an unusual degree of precipi-tancy had marked the progress of this cause in the Superior Court of Chancery, which not only put it out of the power of Hook to obey the process of the Court, but deprived him of an opportunity of canvassing the report of the commissioner, which was eminently erroneous, jirincipally, because it ■proceeded on the basis of the old suit of 1793, although that suit ought to have been considered as at an end; it entered into inquiries foreign to the compromise; it continued the copartnery from March to December, 1795, when, in truth, it was considered in the compromise and missive united as having terminated in March ; it blended together the rights under the original copartnery, and those under the compromise, as if they had been the same; it abandoned the idea of a specific execution at one moment, at another resumed it, and at length included the property of Hook, acquired independently of the copartnery, in the fate of the affairs of the copartnery; it violated the principles which have been established by this Court concerning paper money, debts, and credits; and its items were in very many instances plainly erroneous. For these reasons it was contended that the report ought to be remitted to the chancery for reformation.
With respect to the writ of sequestration, it was a process seldom resorted to in this country, and in the application of it we must be guided entirely by the practice of the Courts in England possessing Chancery jurisdiction. There being no statutory provision on the subject in Virginia, and the consequences of the writ being more calamitous than any other known in the law, every precaution used in England to guard against the oppression of the subject ought to be strictly observed in this country to prevent the oppression of the citizen. By comparing the preliminary steps taken in this case with the practice in England it will be found that there has been a very essential departure from the process used in the Courts of that country previous to awarding the writ of sequestration. Not only has some of the intermediate process been entirely omitted, but the writ itself was grounded on the return of the Sheriff '"‘not found,” when it could alone have been authorised bj' the return of the Sergeant at arms of the Court of Chancery. The reason why the return 'x'of the Sergeant at arms is necessary must be obvious. He is an officer of this Court rec-ogmized by law, (a) and may execute its process in any part of the Commonwealth; the Sheriff in this state, as in England, is confined in the execution of his process to the limits of his own county. It might often happen that a party would be absent from his county on indispensable business when a process was directed to the Sheriff of that county. If then the return of the Sheriff “not found,” should be sufficient to ground this process, a man might be liable to all the consequences of a contempt, without even knowing that he had been called on to perform an order of the Court. But the Sergeant at arms, not being confined to any particular county in the State, may pursue those against whom he has process into any part of the Commonwealth, if they should not be found in their own proper county: and the Court will never proceed to a writ of sequestration till it is justified by a return of its own officer. Such being the caution observed in England in favour of the liberty of the subject, what good reason can be given, why we should dispense with it in this country, especially when there is no,, statute authorising our Courts to narrow its limits? Even if I-Iook *148 had been guilty of a contempt, still, after presenting his petition to the Chancellor, and obtaining a supersedeas to the writ of sequestration, it might have been supposed that his contempt was cleared, and that he stood before the Court as any other person. There existed then no right to go back to his former conduct: much less right was there to presume against him a sum of money, when all that could have been presumed was that he had lands, slaves, and personal estate. As to the claim for an extra allowance to John E. Price, the agent of Ross before the sequestrators, it was inadmissible, because the sequestration itself was irregularly issued.
It was also argued that the attachment issued irregularly in this case, because it was absolute in the first instance, and was moreover grounded merely on the report of the commissioner; whereas, to authorise an attachment, a rule nisi ought to have preceded it, and it must appear that some process or specific order of the Court, which had been served upon the party, had been disobeyed. On this point and the doctrine of sequestrations, the counsel for the appellants cited, 1 Harr. Ch. Prac. 242, 245, 246, 2S0, 2S4, 2S6, 257, 259, 322, 323 ; 2 Comyn’s Dig. 36; 6 Bac. Gwil. edit. 136; Gilb. Ch. 17; 2 Solicit. Guide, 519.
*On the part of the appellee it was insisted, that the conduct of Hook, in contemning the process of the Court and defying its justice, imposed on the Judge and the commissioner, the necessity of resorting to the measures which had been pursued; that it was impossible for Ross to ascertain the situation of the property embraced by the compromise, or the mutations which it had undergone since the date of that instrument, unless a discovery could be had from Hook ; that Hook having refused to make any disclosure, or to furnish the necessary books and papers, the Chancellor was warranted in directing the commissioner to presume against him as a spoliator, and to make the best report he could from the documents which could be procured; that the commissioner was justified in calling for the books of Hook and Ross, because all the property was constituted partnership effects, by the compromise, and without an examination of the books it was impossible to tell what debts were due to the firm; consequently the account could not be taken without them. Under the circumstances of this case the commissioner was compelled to resort to that evidence which was in his power. Ross had it in his power to prove the original partnership and stock in trade;,and a report was made up, (grounded on those data,) allowing a very moderate profit upon the capital employed, which produced a larger sum than that decreed by the Chancellor.
Although a Court of Chancery may commit to prison for a contempt, in suppressing documents, yet there is no necessity for doing so. A shorter course may be pursued. The Court may presume against the party immediately, and he may avoid the presumption by complying with the mandates of the Court. Every thing may be presumed in odium spoliatoris:(a) and, where the party is in possession of documents, and suppresses them, the Court may presume at once, (b)
The decree of the Chancellor was right in directing a sum of money to be paid instead of a specific execution of the compromise.. That Hook was originally indebted to-Ross, was clearly proved; and it was only necessary to allow the latter a reasonable profit on his stock, and compensation for his trouble, to ascertain the amount of that debt. Though the compromise would have been advantageous to Ross, yet, as Hook-refused to give any information concerning the property, it was impossible to take any account of it; and it is now too late for him to avail himself of his own act or to-claim the benefit of the compromise. *If the cause were sent back, there would be no chance for justice; because the whole process of the Court had before been tried without effect. But, if the Court should not be inclined to adopt the report of the commissioner, founded on the data already mentioned, it would be proper to adopt the second report, grounded on the report of the sequestrators and such other evidence as could be collected, with respect to the value of the property included in the deed of compromise, and to decree the payment of money. The property having been restored to Hook after the discharge of the sequestration, the presumption is, tha-t part of it has either been consumed or sold by him. If the decree should be for a specific performance, it would produce endless litigation: for, Hook having conveyed away the property, the purchasers might contend that it was not liable in their hands, in consequence of the want of either actual or implied notice.
With respect to the process, it was argued that the attachment issued regularly, and was a proper foundation for a writ of sequestration. There is a known difference between process of contempt issuing after and before appearance. If the party have not appeared, he is considered not rectius in curia; but, after appearance, he is supposed to be conusant of all the proceedings in the cause. A rule will be granted to shew cause in the one case, and not in the other. The rules of proceeding in a Court of. Chancery were adopted from the canon and civil law, with a mere variation in the names of the process. If -the party once appear, none of the previous process is necessary. All that is required is, that the party shall have notice of the order, (c) It is believed that the rule to shew cause never issues in England, if the contempt áp-pear upon the record, (d) The report of the commissioner is conclusive as the ground of an attachment, (e) Hook ought to have shewn why the order ought not to have been complied with; befcause it is settled that, unless exceptions be particularly pointed out, the report of the commissioner will stand confirmed of course, (f) The *149 sequestration* issued property, (a) The return of the sheriff, who is the only officer known in our laws, to execute process, is equal to that of a Sergeant at arms. This is a mere fanciful officer; and his services would have been dispensed with in England, had not the Court, on his complaining of the innovation which deprived him of his fees, agreed to continue 'x'the old process, for his benefit alone, (b) The books of practice in England prove that, on a return of non est in-ventus on an attachment, a sequestration issues, (c) The difference between process before and after appearance or judgment is laid down in 5 Bac. Abr. 239; Cro. Ja. 577; 5 Com. Dig. 632; Barnes’ Notes, 322; Solicit, Guide, 486. There was no necessity for a specific order for Hook to produce the books; because it is the constant order of the Court that the commissioner has a right to require whatever is necessary to enable him to take the account. As to the precipitancy which had been complained of, it would be seen that the cause had been depending more than three 3'ears; and as Hook has, in no stage of the business, except when he was under the operation of process of contempt, come forward to shew cause against any of the orders taken in the cause, the presumption is, that he thought them right, as they in truth were, and according to the settled practice of the Court.
With respect to the claim for compensation to John P. Price, it was contended by the counsel of Ross that it was just and proper. All that the sequestrators could do was to ascertain, from the records, and from other information, that Hook possessed certain property. But the property could neither be identified sufficiently, nor could it be collected without the aid of some person, who had some knowledge of its situation. The services of John P. Price were, therefore, necessary to enable the se-questrators to perform their duty, and the sum allowed very reasonable.
Thursday, June 25. The Judges delivered their opinions.
JUDGE TUCKER.
I shall at present only notice chat part of the decree which relates to the order of sequestration and the expenses attending it, which Hook was directed to pay; and which, if the order of sequestration was regular, he was bound to •pay.
That Hook was in contempt for not obeying the order of October, 1800, X think unquestionable from the particulars noticed in the commissioner’s report: I therefore hol’d the order for the attachment for such contempt to have been perfectly re'gular, that being the first process of contempt; (2 Sol. Guide, 511,) and generally obtained of course, on affidavit, (Ibid. 512,) and the Sheriff is the proper officer to execute it. (Ibid. 515.) And if he returns a *non est inventus, thereon, an attachment with proclamations issues. {Gilb. Ch. 35.) Upon this process two returns maybe made; either a non est inven-tus, upon which an attachment with proclamations issues of course, or a cepi corpus: if he ’ returns the latter, the next step is a habeas corpus to bring up the body; for the Sheriff cannot carry him out of his county. (Gilb. Ch. 70.) And, if, upon an attachment for not performing a decree, the Sheriff returns cepi corpus, and lets the party to bail, (which he should not do, where the writ is marked for the execution of a decree,) there a sequestration is granted immediately. (Ibid. 191.) So, if he be brought up by habeas corpus, and will not perform the decree, but obstinately lies in prison. (Ibid. 191, 192; Ross v. Colvile, 3 Call, 382.) If upon an attachment with proclamation, the Sheriff return non est inventus, a commission of rebellion issues; and, if upon that, a non est inventus be returned, the Sergeant at arms, who is the immediate officer of the Court, is sent to seek him. (Gilb. Ch. 35.) And this officer our law expressly authorises the Court to appoint. (L. V. 1794, c. 64, s. 10.) And he may execute the order of the Court in any part of the State, where the party may be found, which the Sheriff could not; and he might also, as I conceive, bring up the body of the party in contempt, without committing him to the jail of the county, and waiting for a habeas corpus, as the Sheriff must. After all this process, if a non est inventus be returned, a sequestration issues. (Gilb. Ch. 35, 36.) All this is analogous to the process to compel an appearance as detailed and explained. (Gilb. Ch. 38, 77.) And when oncea defendant is in contempt, he must clear it before he can be heard. (Ibid. 34, 216.)
According to these authorities, (there being no express direction in our laws upon the subject,) the order of sequestration was premature and irregular. And had Hook appealed from it he might have reversed it. But, instead of appealing, he made a voluntary offer to execute the deed of trust for performing the decree, upon which the sequestration was superseded. But his subsequent conduct was equally contumacious as it had been before; and therefore he is not entitled to the favour of the Court. But the sequestration being irregular, he ought to be relieved from paying ail the expenses of it, and from paying those of John E. Price, the plaintiff’s agent: but the regular expenses of the sequestration ought to be borne between the parties, for the reasons stated in the decree, in which I concur with the Court.
* JUDGE LYONS was of opinion that the sequestration was improperly awarded.
JUDGES FLEMING and ROANE
did not express their sentiments upon that point, except so far as they concurred in the following opinion, which was entered as the decree of the Court.
“This day came the parties by their counsel, and the Court, having maturely considered the transcript of the record of the decree aforesaid, and the arguments of counsel, is of opinion that the said decree is erroneous in this, that it doth not direct a specific performance of the contract of compromise concluded between the parties on the thirtieth and thirty-first days *150 of March, 1795, so far as it was in the power of the Court to decree the same— Therefore, it is decreed and ordered, that the said decree be reversed and annulled, except so far as it may be affirmed by the decree of this Court hereafter pronounced ; and that the appellee pay to the appellant his costs by him expended in the prosecution of his appeal aforesaid here. And the Court not approving- of the special order of sequestration made by the Court in this cause, upon the return of ‘not found’ made on the attachment theretofore issued against the appellant, John Hook, for his contempt in refusing to attend the commissioner, pursuant to a former order of that Court, which, according to the established course of proceeding in Courts of Equity, was wholly irregular; nor approving of so much of the said decree as directs the appellant to pay all the expenses incurred in the execution of that irregular proceeding, including the compensation due to John Fleming Price, (who appears to this Court to have been the special agent of the appellee, David Ross,) for th’e services rendered by him on the same occasion; doth, for these reasons, so far reverse and annul the said decree; yet considering that the said John Hook might, if so disposed, have appealed from the said order of sequestration, and that both his former and subsequent contumacy, and concealment of the information which he was bound to have given, do not entitle him to the favour of a Court of Equity, and also considering the deed of trust voluntarily tendered to the Court, and' executed by him, to obtain a removal of the said order of sequestration, as furnishing at this time the most effectual means of enforcing *his compliance with the decree which this Court is about to make, it is therefore decreed and ordered by the Court, that all the expenses which were incurred in the execution of the said order of sequestration (except the allowance made to the said John Fleming Price for his services) be paid, the one half by the said John Hook, and the other half by the said David Ross; and that the said David Ross do moreover pay the expenses of the said John Fleming Price his agent. And this Court proceeding to pronounce such further decree as the said Superior Court of Chancery should have pronounced, it is further decreed and ordered that, unless the appellant John Hook do and shall, on or before a certain day to be appointed by the Superior Court of Chancery for the Richmond District, make out and render upon oath, or other satisfactory evidence, to the said Superior Court of Chancery, or the commissioner thereof, if directed to do so by that Court, a fair schedule of every species of property in lands, monies, slaves, goods, debts, and chattels of every kind whatsoever, which he had in possession, or any other person for his use, or to which he was entitled by any bargain, contract, claim or demand whatsoever, either in law or equity, on the thirtieth day of March, 1795, with the exceptions, and those only, particularly mentioned and enumerated in the indenture of compromise made and concluded between the parties on that day, and do also make out and render, upon oath, or other satisfactory evidence as aforesaid, a fair, just, and true inventory of the new goods on hand and in the possession of the said John Hook, or any other person for his use, on the thirty-first day of March, 1795, and debit himself therewith in account with Ross and Hook at the first cost and charges; and a like inventory of the remains of the old goods, then also on hand, as aforesaid, and debit himself therewith.as he shall in his conscience judge them to have been worth, according to their quality; and a like inventory of all the rj’e then on hand, as aforesaid, and debit himself therewith at the rate of two shillings and nine pence per bushel, according to the true intent and meaning of a supplementary agreement between the parties, made and concluded the thirty-first day of March, 1795, aforesaid; and do, moreover, make out and render upon oath or other satisfactory evidence as aforesaid, a just and true account of all his dealings and transactions, from the day and year last mentioned, to the twenty-fifth day of December, 1795, including “'both days, so far as the same, according to the true intent and meaning of the said indenture of compromise, and the supplementary agreement concluded between the said parties on the thirtieth and thirty-first days of March, 1795, respectively, were made for the benefit, or on the joint account of the said Ross and Hook; including in such account a just and true roll or list of all lands, tenements, slaves and their increase, with their respective prices and cost, which he, the said John Hook, hath acquired or is entitled to, either in law or equity, by virtue of any land-warrant or warrants acquired, or by virtue of any bargain, contract or purchase whatsoever, made or concluded with any person or persons whatsoever, at any time before the twenty-fifth day of Decenr-ber, 1795, or on that day; together with a just and true account of the rents, issues, profits, hire, or annual value of the labour of the slaves and lands, with the increase of the slaves, if any, to the satisfaction of the said Superior Court of Chancery, s.o as to enable the said Superior Court of Chancery, or the commissioner thereof, to make and state a fair and just account thereof, and to direct and make a fair and equitable dividend of the same between the parties, according to the true intent of the compromise and agreement between the parties before mentioned; — so much of the decree of the said Superior Court of Chancery, pronounced on the twentj'-fourth day of March, 1802, as declares the balance due from the said John Hook to the said David Ross to amount and be equal to sixteen thousand three hundred and forty-seven pounds four shillings and seven pence halfpenny, with interest on the balance of the principal money, (being twelve thousand two hundred and twenty-nine pounds twelve shillings and two pence three farthings,) from the first day of January, 1802, until the said twenty-fourth day of March, 1802, with the costs incurred by the plaintiff in prosecuting his suit, exclusive of the expenses incurred in executing the order of sequestration and of the compensation due the said John F. Price, the agent of the *151 plaintiff as herein before mentioned, be affirmed ; and that Andrew Donald, William Mitchell, of Liberty; Thomas Lumpkin, Samuel Hancock, and Joseph Dickinson, all of Bedford County; and James Penn, of Campbell Count}', or the survivor or survivors of them, or a majority of such survivors, or such other person or persons as the said Superior Court of Chancery shall appoint for that purpose, do thereafter proceed to make a fair 'xand equitable dividend and allotment between the parties, of all and singular the lands, slaves, and their increase, and other property comprised or intended to be comprised in the indenture of compromise concluded between the parties on the thirtieth day of March, 1795, with the exceptions therein mentioned, and such as may be contained or meant to be contained in the supplementary agreement concluded also between the parties on the succeeding day, so far as the same have, or shall come to the hands, possession, or knowledge of the said commissioners aforenamed, or such others as may be appointed by the said Superior Court of Chancery; and that they, do allot, assign, appoint, deliver, transfer and convey to the said David Ross, his heirs, executors and administrators, two-third parts of all and singular the said lands, tenements, slaves, and other property, according to the quantity, quality, and value of ¡.he same, as his share or dividend of the capital stock of the copartnership of Ross and Hook, and allot the remaining one-third part to the said John Hook, his heirs, executors and administrators ; debiting the said David Ross with the lands, slaves, and other property in his dividend, according to the true value thereof, as an offset or discount against the said sum of sixteen thousand three hundred and forty-seven pounds four shillings and seven pence half-penny, with the interest thereon pronounced to be due to the said David Ross, by the decree of the Superior Court of Chancery aforesaid: and if after such dividend and offset made any balance shall remain due to the said David Ross from the said John Hook, then the person or persons, by whom such dividend and offset shall be made, or any two or more of them, shall proceed to sell and convey so much of the lands, slaves, and property allotted by them to the .said John Hook for his dividend as aforesaid, or so much of the lands, slaves, and personal estate comprised, meant, or intended to be comprised in the indenture of trust made and concluded between the said John Hook, of the one part, and the said Andrew Donald, William Mitchell, of Liberty; Thomas Lump-kin, Samuel Hancock, and Joseph Dicken-son, all of Bedford County; and James Penn, of Campbell County, in such manner as the said Superior Court of Chancery shall direct, as may be sufficient to discharge the said balance, and that the same be paid to the said Ross in satisfaction of the said decree, and in full of the demand stated in his bill: and, in case the lands, slaves, *and property so to be sold to make up such balance, shall prove insufficient to discharge the same as aforesaid, that then and in that case the said John Hook do pay the balance thereafter remaining to the said David Ross; and that the said John Hook do moreover, at such time or times, and in such manner as the said Superior Court of Chancery shall direct, make and execute, or cause to be made and executed, a good and sufficient conveyance or conveyances in law and equity, according to the nature of his estate and interest in the lands, tenements, slaves, goods and chattels which shall and may be appointed to the said David Ross for his dividend and proportion of the same, with a special warranty for the same, according to the tenor and effect of the said indenture of compromise; and that the said David Ross, on his part, do execute and deliver to the said John Hook such a guarantee as the said Superior Court of Chancery shall direct, for securing the said Hook against all debts contracted in Great Britain on behalf of the said Ross and Hook, and also for any contract made by the said John Hook for account of Ross and Hook, or by the said David Ross for the same account. And that so much of the residue of the said decree pronounced by the’ said Superior Court of Chancery as is not contrary to this decree, be likewise affirmed. But in case the said John Hook shall, upon oath or other satisfactory evidence, render to the said Superior Court of Chancery, to the satisfaction of the said Court, a fair and just schedule, inventories and accounts, as herein before mentioned, so as to enable the said Superior Court of Chancery, or the commissioner thereof, to make and state a fair and just account between the parties, and to direct and make a fair and equitable division of the capital or joint stock of the said Ross and Hook, and to adjust and settle the accounts between them, finally, according to the true intent and meaning of the compromise and supplementary agreement between the said parties herein before mentioned, then and in that case, so much of the decree of the said Superior Court of Chancery, pronounced on the twenty-fourth day of March, 1802, as declares the balance due from the said John Hook to the said David Ross to amount and be equal to sixteen thousand three hundred and forty-seven pounds four shillings and seven pence half-penny, and as directs the payment of the same by the said John XJook to the said David Ross, with interest *'on twelve thousand two hundred and twenty-nine pounds twelve shillings and two pence three farthings . part thereof, or, in default of such payment by the said John Hook, as directs the sale of the lands, slaves, and other property comprised or intended to be comprised in the indenture made the fourth day of December, 1804, between the said John Hook of the one part, and Andrew’ Donald and others of the other part, or so much thereof as may be sufficient to satisfy that decree, by commissioners therein after named, in manner therein prescribed, and that the money to be produced by such sale be paid to the said David Ross, in satisfaction of the said decree, and of the demands in his bill, and the surplus of the proceeds of the sale, if any, be paid to the said John Hook, and if the proceeds thereof, together with the sums secured by the bonds taken *152 by the sequestrators for property sold, or slaves hired out by them, under a prior order of that Court, shall prove insufficient for the discharge of the sums of money, interest, expenses and costs therein directed, that, in that case, the said John Hook do pay the balance to the said David Ross; and as appoints commissioners to execute that decree, be reversed and annulled ; and that the commissioner of the said Superior Court of Chancery, or such other person as that Court shall appoint, do thereafter proceed to state an account of all payments made by the said Hook to the said Ross, since the thirtieth day of March, 1795, and do moreover form a roll or list of the lands and tenements whereof the said John Hook was seised on that day, or which he hath acquired, or is entitled to, either in law or equity, by virtue of any land-warrant or land-warrants acquired, or any bargain, sale or contract whatsoever, made or concluded by the said John Hook, with any person or persons whatsoever, at any time before the 25th day of December, 1795, or on that day, with the exceptions, and those only, mentioned in the deed of compromise concluded between the parties on the thirtieth day of March, 1795, together with an inventory of the sales and their increase, monies, goods, debts, and chattels, constituting the capital or joint stock of the said Ross and Hook on that day, according to the true intent and meaning of the said compromise; with an estimate of the said lands and slaves, and an account of the said goods, old and new, and rye then on hand, according to the true intent and meaning of the supplementary ^agreement concluded between the parties on the thirty-first day of March, 1795; and also an account of the profits of that copartnership from the said thirtieth day of March, 1795, to the twenty-fifth day of December following, including both days; excluding from that account any profit which the said John Hook may have made on the new or old goods, or rye on hand, on the thirty-first day of March, 1795, which, according to the terms of the supplementary agreement of that day, became his private property, from the time he may have taken an inventory thereof; together with an account of the rents, issues, hire, and profits of the lands and slaves, either in the hands of the said John Hook, or of the sequestrators appointed by a former order of the said Superior Court of Chancery, with the sums secured by the bonds taken by the sequestra-tors for the property sold, or the slaves hired out by them under that order; and state a final account between the parties, crediting the said David Ross with two-third parts, and the said John Hook with one-third part of the said capital or joint stock, and debiting each with whatsoever he hath received or may receive, on a division thereof, as hereafter directed, in lands, slaves, and other specific property, or in money or otherwise, on account of his proportion or share thereof; and that the said lands, slaves and other specific property, and the debts due to or belonging to the said capital or joint stock, be divided and apportioned by commissioners to be appointed by the said Superior Court of Chancery, according to quality, quantity, and value, between the said parties; assigning to the said David Ross two-third parts, and to the said John Hook one-third part of the same, and, after-such division and allotment made, that the said John Hook, upon receiving from the same David Ross such a guarantee as the said Superior Court of Chancery shall direct to be executed by him for securing the said Hook against all debts contracted in Great Britain, on behalf of the said Ross and Hook, and from any contract made by the said John Hook for account of Ross and Hook, or by the said David Ross on the same account, do seal, execute and deliver, or cause to be executed and delivered to the said David Ross, at such time or times, and in such manner as the said Superior Court of Chancery .shall direct, a good and sufficient conveyance or conveyances, assignment or assignments, in law and equity, according to the nature and interest which the said John Hook hath *or may have in the lands, tenements, slaves, goods, chattels, debts, with the bonds or other securities for debts, which may be appointed and allotted to the said David Ross for his dividend and proportions of the said capital or joint stock of Ross and Hook, with a full and special warranty for the same, and do deliver peaceable possession of the same: and that the said David Ross be debited with the lands, slaves, and other specific property, so as aforesaid comprised in his share or dividend, and assigned, conveyed, transferred and delivered to him, in pursuance of such division, according to the true value thereof, in the estimate and account herein before directed to be made, as an offset or discount against his proportion of the said capital or joint stock of Ross and Hook, and also with all payments made to him by the said Hook, or on his behalf at any time, since the 30th day of March, 1795. And if, after such dividend and offset, or discount made, any balance shall remain due to the said David Ross for his share of the said capital or joint stock, or of the rents, issues, hire and profits of the lands and slaves, that the same be paid to the said David Ross out of the monies received by, or secured by the bonds taken by the sequestrators appointed by the said Superior Court of Chancery for property sold, or slaves hired out by them under an order of the said Court, if sufficient for that purpose, exclusive of the expenses and costs (except as herein before excepted) by the decree of the said Superior Court of Chancery directed to be paid thereout; but, if the same shall prove insufficient for the discharge thereof, that, in that case, the said John Hook do pay the balance to the said David Ross; and in case of failure or default on the part of the said John Hook in making such payment, then the commissioners who shall be appointed by the said Superior Court of Chancery to carry this decree into effect, or such of them as the said Court shall direct, shall proceed to sell, in such manner as the Court shall direct, and convey so much of the lands, slaves, and- personal property which may be allotted to the said John Hook, for his dividend as aforesaid, or so much *153 of the lands, slaves and personal estate comprised or meant to be comprised in the indenture of trust executed the fourth day of December, 1801, between the said John Hook of the one part, and Andrew Donald and others of the other part, as may. be sufficient to discharge the said balance; and that the same be paid to the said *David Ross, in full satisfaction of all the demands stated in his bill; and, in case the lands, slaves, and other property so to be sold, to make up such balance, shall prove insufficient to discharge the same, as aforesaid, then the said John Hook shall pa3r the balance thereafter remaining, to the said David Eoss. But if, upon such final settlement and adjustment of the accounts between the parties, as herein before directed, any balance shall be found to be due from the said David Eoss to the said John Hook, the same shall be paid to the said John Hook, in like manner as any balance which may be found to be due to the said David Eoss, as herein directed to be paid to him. And that the said John Hook do pay the costs incurred in the Superior Court of Chancery, except as herein before excepted. And that, upon the said John Hook’s performing this decree, the said indenture of trust, made on the fourth day of December, 1801, be delivered up to him to be cancelled. And so much of the decree of the said Superior Court of Chancery, as is not contrary to this decree, is hereby affirmed. And the cause is sent back to be proceeded in, in that Court, according to the principles in this decree.
“Which is ordered to be certified to the said Superior Court of Chancery.”

 In odium spoliatoris oinnia prassumuntur.

 See Rev. Code, 1 v. p. 64, c. 64, sect. 10.

 1 P. Wms. 733, Dalston v. Coatsworth.

 3 P.wms. 748. Cowper v. Earl Cowper.

 1 Howard Exch. Prac. 778; Har. Ch. Pr. 661.

.(d) Glib. Forum Romanum, 70, 81: 1 How. Excheg. Prac. 736.

 How. Exch. Prac. 800; 3 Comyn’s Dig; 223; 2 Fowl. Excb. Prac. 297, 298; 3 P. Wms. 142, note B.

 3 Call, 23; Ibid. 382.

ta) Glib. For. Tiom. 85; Hinder’s Prac. 186; 1 How. 13xcb. Prac. 774.

' (b) Preced. In Oban. 558.

 1 liar. Cb. Prac. 254.